kIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LLOYD FAIRLEY, JR., | ) | CASE NO. 1:16CV1008 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lloyd Fairley, Jr. ("Fairley") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to explain what he meant when he included a limitation in his residual functional capacity assessment that Fairley "must be able to change position in his seat as needed for comfort" and testimony from the Vocational Expert does not shed light on this limitation. Thus, the Court cannot ascertain whether this limitation is in conflict with the Dictionary of Occupational Titles and would warrant further investigation by the ALJ. Accordingly, the decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

Fairley filed applications for DIB and SSI on February 6, 2013, alleging a disability onset date of March 5, 2012. Tr. 12, 182, 212. He alleged disability based on the following: post-

1

traumatic stress disorder, depression, bipolar disorder, schizophrenia, diabetes, disc herniation L3-L5, high blood pressure, supraventricular tachycardia, complex medial meniscus tear in left knee, and left hip contusion and sprain.  Tr. 228.  After denials by the state agency initially (Tr. 101-102) and on reconsideration (Tr. 129-130), Fairley requested an administrative hearing.  Tr. 156.  A hearing was held before Administrative Law Judge ("ALJ") Frederick Andreas on January 29, 2015.  Tr. 40-76.  In his April 17, 2015, decision (Tr. 12-35), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Fairley can perform, i.e., he is not disabled.  Tr. 34.  Fairley requested review of the ALJ's decision by the Appeals Council (Tr. 7) and, on March 9, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Fairley was born in 1966 and was 46 years old on the date his applications were filed.  Tr. 34, 212.  He graduated from high school.  Tr. 229.  He previously worked in a steel mill as a vacuum operator and at a paper factory as a wrapper.  Tr. 69-72.  He last worked in 2012.  Tr. 48.

### B. Relevant Medical Evidence[1]

In April 2010, Fairley saw chiropractor Brian C. Studer, D.C., after a car accident.  Tr. 297-304.  Fairley complained of headaches, neck pain, back pain, shoulder pain, and left wrist pain.  Tr. 298.  He improved with treatment but continued to have intermittent muscle spasms/guarding within his bilateral lumbar region.  Tr. 303.

---

[1] Fairley only challenges the ALJ's medical findings regarding his carpal tunnel syndrome.  Accordingly, only the medical evidence relating to Fairley's carpal tunnel syndrome are summarized and discussed herein.

2

A treatment note from March 2011 states that Fairley's type 2 diabetes was under extremely poor control, which, Fairley admitted, was because of poor dietary restrictions: ingesting soda pop, a lot of candy, and chocolate.  Tr. 328.  Treatment notes in May and July 2011 show that he was not doing appropriate blood sugar monitoring.  Tr. 326, 324.

On March 5, 2012, Fairley went to the Mercy Regional Medical Center after he fell through a grating at work, hitting his left leg and hip on a steel bar.  Tr. 361.  X-rays were unremarkable and Fairley was diagnosed with left hip and knee strain/contusion and lumbar strain/sciatica.  Tr. 362.  The next day, he saw Dr. Studer, who found, among other things, left-sided trapezius spasms.  Tr. 374.  Fairley was using a cane to walk.  Tr. 374.

On April 2, 2012, Fairley underwent an independent evaluation with Dr. Paul Martin, M.D., complaining of bilateral knee pain, bilateral upper extremity numbness and tingling, left low back and hip pain and spasm, and "some neck problems."  Tr. 378-379.  Upon exam, he had an antalgic gait to the left and carried a cane.  Tr. 379.  He had significantly limited left hip range of motion based on his reports of pain, but no evidence of soft tissue swelling.  Tr. 379.  His low back was moderately tender to palpation on the left side and he had a fairly limited lumbar spine range of motion due to reported pain, but no evidence of muscle spasm and a normal lumbar lordosis.  Tr. 379.  He had low back pain upon slight dorsiflexion of his ankle and great toe while supine and increased low back pain with hip range of motion and head compression.  Tr. 379.  He had intact motor function and normal sensation and deep tendon reflexes in his bilateral lower extremities.  Tr. 380.  He complained of significant left knee pain in a fairly diffuse pattern.  Tr. 380.  Dr. Martin answered all the questions submitted to him in the form with respect to Fairley's back, hip and knee impairments; based on these, Dr. Martin opined that

3

Fairley was unable to return to work without a restriction and had not reached medical maximum improvement at that time.  Tr. 380-381.

On May 1, 2012, Fairley saw Satish Mahna, M.D., complaining of back and leg pain as well as intermittent neck pain and intermittent tingling, numbness and weakness in his left hand.  Tr. 408.  He was using a cane in his left hand to ambulate.  Tr. 408.  Upon exam, he had tenderness in his left and posterior trapezial muscle with spasms, no focal trigger points, and "some" restricted range of motion in his cervical spine.  Tr. 408.  His upper extremities were unremarkable except for complaints of tightness in his trapezial areas with overhead reaching and a positive Phalen sign, left greater than right.[2]  Tr. 408.  His upper extremities had normal neurological findings: no muscle atrophy or motor or sensory deficits.  Tr. 409.  Dr. Mahna diagnosed Fairley with a sprain/strain in his back and left hip and knee, and "believe[d]" that, "considering the mechanics of [Fairley's] injury," he suffered a cervical strain/sprain.  Tr. 409.  Dr. Mahna recommended MRIs of Fairley's lumbar spine and left knee as well as trigger point injections in his lumbar paraspinal muscles and prescribed Percocet.  Tr. 409.

On October 4, 2012, Fairley underwent an independent medical evaluation with Dr. Ira Ungar, M.D.  Tr. 410-417.  Among his chief complaints of back, left hip and left knee pain, Fairley also complained that his hands go numb.  Tr. 411.  Upon examination of Fairley's lumbar spine, Dr. Ungar commented that Fairley made exaggerated complaints of discomfort at extreme ranges of motion.  Tr. 413.  Fairley exhibited exaggerated pain behavior "and 6 out of 7 Wadell signs for somatic amplification are positive suggesting significant symptom magnification."  Tr. 413.  An examination of his cervical spine showed no atrophy, spasm, or dissymmetry.  Tr. 414.  His head posture was normal and his motion was smoothly coordinated.  Tr. 414.  He had minor

---

[2]  A positive Phalen sign is when numbness or paresthesias appears within 30-60 seconds after the test and indicates the presence of carpal tunnel syndrome.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1714.

4

discomfort upon palpation of his paracervial muscles but no evidence of "tender or trigger points." Tr. 414. Manual muscle testing of his upper extremities showed no weakness or evidence of atrophy bilaterally. Tr. 414. His grip strength was strong and equal bilaterally and distal sensation was intact over all dermatomes. Tr. 414. Dr. Ungar found no evidence of cervical myelopathic deficits by numbness, weakness or Hoffman's tests. Tr. 414. Fairley's deep tendon reflexes in his biceps, triceps and brachioradialis were symmetric bilaterally. Tr. 414. Dr. Ungar answered all the questions submitted to him in the form with respect to Fairley's back, hip, knee and neck impairments; based on these, Dr. Ungar opined that Fairley was able to return to work without restrictions and had reached medical maximum improvement at that time. Tr. 416.

On December 26, 2012, Fairley saw Dr. Mahna and had tenderness and spasm in his posterior and left trapezial muscle and "some" restricted range of motion in his cervical spine; he carried a cane in his left hand for ambulating; and had a normal neurological examination of his upper extremities. Tr. 388.

On March 26, 2013, Fairley reported that his pain had gotten worse, 10/10, and Dr. Mahna prescribed Neurontin. Tr. 529-531. His physical examinations remained unchanged. Tr. 530.

On April 16, 2013, Fairley complained to Dr. Mahna of "pressure type neck pain" without radiation into his upper extremities and intermittent tingling, numbness and weakness in both hands, left worse than right. Tr. 532. The neurological exam findings of his upper extremities were normal. Tr. 533. Fairley reported that he had stopped taking Neurontin about two weeks prior because of side effects. Tr. 534.

On September 25, 2013, Fairley underwent arthroscopic surgery of his left knee with a

5

partial medial meniscectomy. Tr. 620. In a follow-up visit a month later, he had full motion and his preoperative pain was gone. Tr. 619.

On October 8, 2013, Fairley had an EMG study based on his complaints of numbness in his hands and his history of diabetes mellitus type 2. Tr. 616. The study showed mild bilateral median nerve compression neuropathy at the wrists consistent with a diagnosis of mild bilateral carpal tunnel syndrome, slightly worse on the left side. Tr. 616. The reviewer also stated that Fairley's history of diabetes was resulting in developing changes of early peripheral neuropathy. Tr. 616.

Fairley continued to see Dr. Mahna, who continued to report the same findings as in previous visits; i.e., neck "essentially unremarkable," with tenderness and spasm in his left and posterior trapezial muscle and some restriction of range of motion in his cervical spine; he carried a cane in his left hand for ambulating; and he had a normal neurological examination of his upper extremities. Tr. 693, 696, 699, 702, 705, 708. Fairley started back on Neurontin. Tr. 700.

On October 10, 2014, Fairley went to the emergency room complaining of pain in his knees, low back and neck for the last week. Tr. 599. Upon exam, he had a supple and non-tender neck with full range of motion. Tr. 599. He had a normal gait. Tr. 601. He had normal muscle strength and tone, normal digits, and full range of motion and no tenderness in his upper extremities. Tr. 601. He had tenderness in his bilateral lumbar paraspinal muscles. Tr. 601. He was diagnosed with chronic back pain and diabetic neuropathy, was given prescriptions (Percocet and Naprosyn), and discharged home. Tr. 601, 603.

   C. **Opinion Evidence**

      1. **Physical therapist's functional capacity evaluation**

On February 6, 2015, Fairley underwent a functional capacity evaluation with a physical therapist.[3] Tr. 719-722. His past medical problems were listed as hypertension, heart problems, diabetes, and neck, back, hip and knee problems. Tr. 719. Upon exam, his trunk flexion was 50% of normal, his extension was 25% of normal, and his bilateral side bend was 50% of normal. Tr. 719. His upper extremity strength was decreased, 4/5, and his shoulder range of motion was decreased. 720. The range of motion in his elbows, forearms, wrists and hands was normal. Tr. 720. His grip and pinch testing was significantly below normal; the evaluator wrote, "Mr. Fairley did not demonstrate maximum effort with grip and pinch testing." Tr. 720. He displayed poor body mechanics with the lifting tasks. Tr. 721. The evaluator opined that Fairley had decreased grip and pinch strength, decreased fine finger manipulation, and decreased gross motor coordination. Tr. 722. The evaluator stated that Fairley could perform sedentary work with occasional standing, walking, repetitive arm movements, hand controls, and foot controls, among other postural limitations. Tr. 722. The evaluator opined that Fairley could lift and carry 10 to 15 pounds occasionally and 0 to 5 pounds frequently and is unable to work. Tr. 722.

**2. State Agency Reviewers**

On April 22, 2013, state agency physician Diane Manos, M.D., reviewed Fairley's record. Tr. 95-96. Regarding Fairley's physical residual functional capacity, Dr. Manos opined that Fairley was capable of lifting 20 pounds occasionally, 10 pounds frequently, and had no further restrictions with respect to his upper extremities. Tr. 95-96. He could stand and/or walk for a total of four hours, sit for about six hours, and would need to change position in his seat as needed for comfort. Tr. 95.

On August 24, 2013, state agency physician Leslie Green, M.D., reviewed Fairley's file and adopted Dr. Manos's opinion. Tr. 109-111.

---

[3] The physical therapist's name is illegible.

### D. Testimonial Evidence

#### 1. Fairley's Testimony

Fairley was represented by counsel and testified at the administrative hearing.  Tr. 47-71.  He testified that he was injured at work in March 2012 when he fell down a grate at the steel mill and hit his hip, back and knee on the way down.  Tr. 48, 55.  He ended up hanging by his hands from the floor where he fell through and it hurt his neck as well.  Tr. 55.  He received worker's compensation benefits and had surgery on his knee.  Tr. 52-53.

The surgery did not help his knee and it feels like it is getting worse.  Tr. 53.  He currently has pain in both his legs and his upper back when he sits for a long time, and also his hands go numb.  Tr. 54.  He started using a cane after he was injured because his knee was hurting badly.  Tr. 56.  He can walk without the cane but uses it for walking long distances because both his knees will give out.  Tr. 56.  He walks a lot slower than he used to.  Tr. 56.

Fairley stated that he can walk for about 15-20 minutes before his back and legs start hurting.  Tr. 57.  He can sit for about a half an hour and then he has to get up because his legs start bothering him and he has to get up and keep moving for about 20-25 minutes.  Tr. 57-58.  He does this throughout the day.  Tr. 58.  He also lies down during the day a few times for a few hours because his medication causes him to sleep.  Tr. 58-59.  Sometimes he wakes up during the night and takes a hot shower or bath when his body hurts badly enough.  Tr. 60.

Fairley testified that he has difficulty using his hands; he drops things a lot since he got hurt and was left hanging from the floor where he fell through.  Tr. 63.  When asked if he could perform a job that required him to sit for an eight-hour day and do things like put small parts in a box, he stated that he could not perform this work because his legs and arms would start hurting.  Tr. 68.

### 2. Vocational Expert's Testimony

Vocational Expert Kathleen Reis ("VE") testified at the hearing.  Tr. 68-74.  The ALJ discussed with the VE Fairley's past relevant work.  Tr. 69-72.  The ALJ asked the VE to determine whether a hypothetical individual with Fairley's age, education and work experience could perform his past work or any other work if that person had the following characteristics: can lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently; can stand or walk for 4 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday with the ability to change positions in his seat as needed for comfort; can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch or crawl; must avoid concentrated exposure to vibration and all exposure to unprotected heights; must avoid contact with the public and can interact briefly and superficially, i.e., no arbitration, negotiation, or conflict resolution, with coworkers and supervisors; cannot supervise or manage others or be responsible for the safety and welfare of others; and can perform simple routines tasks at the SVP 1 or 2 level with no fast paced production quotas.  Tr. 72-73.  The VE testified that such a person could not perform Fairley's past work but could perform jobs as a document preparer (70,000 national jobs, 1,800 Ohio jobs), press clipping cutter and paster (7,000 national jobs, 50 Ohio jobs), and title addresser (8,900 national jobs, 70 Ohio jobs).  Tr. 73.  The ALJ asked whether the hypothetical individual could perform the jobs identified or any other jobs if the individual was limited to sitting for a total of 4 hours a day and standing or walking for a combined total of 2 hours a day.  Tr. 73-74.  The VE answered that such an individual could not perform any jobs because the characteristics described were less than a full workday.  Tr. 74.

Fairley's attorney asked the VE if her answer would change if the ALJ's first hypothetical individual was limited to occasional bilateral grasping and fingering.  Tr. 74.  The VE answered that there would be no jobs that such an individual could perform.  Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past

      relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his April 17, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2016. Tr. 14.

2.      The claimant has not engaged in substantial gainful activity since March 5, 2012, the alleged onset date. Tr. 14.

3.      The claimant has the following severe impairments: degenerative disc disease with disc herniation at L3, L4, and L5; degenerative joint disease of the knees; diabetes mellitus with peripheral neuropathy; and posttraumatic stress disorder. Tr. 14.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 15.

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §404.1567(a) and 416.967(a), except the claimant can lift and carry twenty pounds occasionally and ten pounds frequently. He can stand and walk four hours and sit six hours out of an

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

eight-hour workday.  The claimant must be able to change position in his seat as needed for comfort.  He can occasionally climb ramps and stairs, and never climb ladders, ropes or scaffolds.  The claimant is limited to occasional stooping, kneeling, crouching, and crawling.  He must avoid concentrated exposure to vibration and all exposure to working at unprotected heights. Public contact should be avoided.  The claimant is able to interact briefly and superficially with coworkers and supervisors.  He is limited to simple, routine tasks of the specific vocation preparation (SVP) one to two skill level that do not have fast pace production quotas.  Tr. 18.

6. The claimant is unable to perform any past relevant work.  Tr. 33.

7. The claimant was born on October 19, 1966 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.  Tr. 34.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 34.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 34.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 34.

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 5, 2012, through the date of this decision.  Tr. 35.

## V. Parties' Arguments

Fairley objects to the ALJ's decision on two grounds.  He argues that the ALJ failed to fully and fairly evaluate his bilateral carpal tunnel syndrome and failed to evaluate the VE's testimony.  Doc. 16, pp. 1, 11-16.  In response, the Commissioner submits that the ALJ's evaluations were proper and supported by substantial evidence.  Doc. 18, pp. 10-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ properly considered Fairley's carpal tunnel syndrome

Fairley argues that the ALJ failed to consider limitations resulting from his carpal tunnel syndrome.  Doc. 16, p. 14.  The Court disagrees.  The ALJ considered Fairley's diagnosis of carpal tunnel.  Tr. 24 ("An electromyogram conducted on October 8, 2013, showed mild bilateral nerve compression neuropathy at the wrists consistent with a diagnosis of mild bilateral carpal tunnel syndrome, slightly worse on the left side (Exhibit 9F/2; 11F/6).").  The ALJ also observed the following in his decision: Fairley reported difficulties using his fingers to pick up small items and dropping things (Tr. 19); he complained numerous times of numbness in his bilateral hands, numbness and tingling in his bilateral upper extremities, and hand weakness (Tr. 20, 21); and he had a positive Phalen's sign bilaterally (Tr. 21).  The ALJ also remarked that Fairley had multiple normal upper extremity examinations (Tr. 22) and that Dr. Ungar found his pain complaints exaggerated (Tr. 22).  He discussed in detail Fairley's evaluation by the physical therapist, including Fairley's decreased upper extremity strength and the evaluator's opinion that

13

Fairley be limited to occasional repetitive arm movements, hand controls, and overhead reaching; he also noted the evaluator's statement that Fairley did not use maximum effort in his grip and pinch test and showed poor body mechanics while lifting.  Tr. 24.

Fairley does not challenge any of these findings by the ALJ.  He only complains that the ALJ relied on the state agency reviewing physicians' opinions, which were rendered before Fairley had the EMG that resulted in a diagnosis of mild bilateral carpal tunnel.  Doc. 16, pp. 13-14.  But this was not error because the ALJ considered Fairley's EMG results.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (rejecting an argument that the ALJ erred when she relied on a state agency reviewer's opinion that was based on an incomplete record because the ALJ reviewed the complete record).

Fairley's argument with respect to his carpal tunnel syndrome is, therefore, without merit.

### B. The Court does not have adequate information to properly assess the ALJ's treatment of the VE's testimony

Fairley argues that the ALJ failed to evaluate the VE's testimony properly.  Doc. 16, p 14.  He asserts that the ALJ: (1) violated Social Security Ruling 00-4p when he failed to inquire whether the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the DOT does not address the limitation—the need to change positions as needed—that the ALJ included in his hypothetical to the VE; (2) failed to inquire "further as to the actual existence of the[] jobs" identified by the VE; and (3) failed to consider whether the jobs identified by the VE exist in significant numbers.  Doc. 16, pp. 14-15.  Defendant contends that the ALJ complied with SSR 00-4p when he confirmed, at the outset of the VE's testimony, that the VE knew to inform the ALJ if her testimony was inconsistent with the DOT; asserts that the fact that the DOT does not address a limitation to change positions in a chair for comfort does not mean that such a limitation is inconsistent with the DOT; and argues that Fairley waived

14

these and his other challenges to the ALJ's treatment of the VE's testimony because Fairley did not raise them at the hearing, despite being represented by an attorney.  Doc. 18, pp. 12-14.

Social Security Ruling 00-4p provides that an ALJ must ask the VE whether her testimony conflicts with the DOT and, if it appears that it does, the ALJ must obtain an explanation for the apparent conflict.  SSR 00-4p, 2000 WL 1898704, at *4.  Here, at the outset of the VE's testimony at the hearing, the ALJ confirmed with the VE that, if the VE were to give an opinion that conflicted with the DOT, the VE should advise the ALJ of the conflict and the basis for the VE's opinion.  Tr. 69.  The ALJ then asked the VE a hypothetical question describing an individual who "must be able to change position in his seat as needed for comfort." Tr. 72.  There was no further relevant discussion about the DOT or what the limitation "change position in his seat as needed for comfort" means, from either the ALJ, the VE, or Fairley's attorney.

It is not clear what the ALJ meant by the ability to change position in a seat as needed for comfort.  The limitation was included in the state agency reviewing physicians' RFC assessments (Tr. 95, 109), which the ALJ gave great weight to.  Tr. 32.  Such a limitation does not appear to describe a sit/stand option, as the limitation states that the individual would need to change position "in his seat."  The ALJ, relying on the state agency reviewing physicians, believed it to be a limitation because he included it in his RFC.  It is possible that the limitation means changing positions while seated such that the individual would be off-task during that time, but this was not discussed at the hearing.  Due to the paucity of the hearing testimony, the Court cannot ascertain whether the ALJ's limitation is in conflict with the DOT, i.e., whether there was any error and if the decision is supported by substantial evidence.  *See, e.g., Smith v. Astrue*, 2012 WL 6839317, at *9-10 (W.D. Wash. Dec. 21, 2012) (reversing and remanding

15

Case: 1:16-cv-01008-KBB  Doc #: 20  Filed: 04/03/17  16 of 16.  PageID #: 848

because the ALJ did not describe what "the opportunity to change position" meant, agreeing that there "is no such thing as changing from the sitting to the sitting position"); *Armer v. Apfel*, 216 F.3d 1086, at *3 (10th Cir. 2000) (unpublished) (reversing when the ALJ's RFC assessment was not specific enough: "The ALJ's finding that claimant would have to change positions from time to time to relieve his symptomatology is equally vague."). Accordingly, the case must be remanded for further articulation. On remand, the ALJ can better explain the limitation "change positions in his chair as needed" and elicit responsive VE testimony. If Fairley wishes to challenge the VE testimony, his attorney should do so at that time.

## VII. Conclusion

For the reasons state above, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[5]

Dated: April 3, 2017

Kathleen B. Burke
United States Magistrate Judge

---

[5] This opinion should not be construed as a recommendation that, on remand, Fairley be found disabled.

16